**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Honorable Marcia S. Krieger**

Civil Action No. 12-cv-01201-MSK-BNB

JOLENE SCHNEIDER; and
BRENDA STROMAN

      Plaintiffs,

v.

WINDSOR-SEVERANCE FIRE PROTECTION DISTRICT,

      Defendant.

_____

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART**
**MOTION FOR SUMMARY JUDGMENT**
_____

**THIS MATTER** comes before the Court pursuant to the Defendant's ("WSFPD")

Motion for Summary Judgment (**# 31**), the Plaintiffs' response (**# 35, 36**), and WSFPD's reply

(**#38**); and the Plaintiffs' Motion to Strike (**# 45**) certain arguments raised in WSFPD's reply,

WSPFD's response (**# 46**), and the Plaintiffs' reply (**# 47, 48**).

## FACTS

The Court summarizes the relevant facts here and elaborates as necessary in its analysis.

The evidence is viewed in the light most favorable to the non-movant.

Ms. Schneider and Ms. Stroman were longtime employees of the WSFPD, serving as

Public Information Officers.  They allege that they were subjected to repeated sexually-tinged

jokes, comments, and hostility from male firefighters and managers, beginning on or about

March 23, 2010.  After they lodged complaints about the harassment, they contend that they

were subjected to further harassment and other forms of retaliation.  Each Plaintiff resigned in

December 2010, alleging that she was constructively discharged.

Each Plaintiff asserts eight claims for relief: (i) hostile environment sexual harassment in violation of Title VII, 42 U.S.C. § 2000e *et seq.*; (ii) disparate treatment on the basis of sex in violation of Title VII; (iii) a claim for "constructive discharge" in violation of Title VII; (iv) hostile environment sexual harassment in violation of the Colorado Anti-Discrimination Act ("CADA"),  C.R.S. § 24-34-301 *et seq.*; (v) disparate treatment on the basis of sex in violation of CADA; (vi) a claim for "constructive discharge" in violation of CADA; (vii) retaliation in violation of Title VII; and (viii) retaliation in violation of CADA.

WSFPD moves for summary judgment (**# 31**) on all claims by the Plaintiffs.[1]  After briefing was completed, the Plaintiffs moved (**# 45**) to "strike" a portion of WSFPD's reply brief that, the Plaintiffs believe, raised a new argument relating to the statute of limitations for the first time in the reply.[2]

## ANALYSIS

### A.  Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party

---

[1]     Although the motion indicates that it seeks summary judgment on all claims, WSPFD's motion appears to address only the Title VII hostile environment and Title VII retaliation claims brought by both Plaintiffs and Ms. Stroman's Title VII disparate treatment claim.

[2]     Because the Court does not consider WSFPD to be asserting any claim premised on the statute of limitations, the motion to "strike" is denied as moot.

with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

*Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual

dispute is "genuine" and summary judgment is precluded if the evidence presented in support of

and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter

for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment

motion, a court views all evidence in the light most favorable to the non-moving party, thereby

favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir.

2002).

     If the movant has the burden of proof on a claim or defense, the movant must establish

every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R. Civ. P.

56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the

responding party must present sufficient, competent, contradictory evidence to establish a

genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th

Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine

dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material

fact, no trial is required.  The court then applies the law to the undisputed facts and enters

judgment.

     If the moving party does not have the burden of proof at trial, it must point to an absence

of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.

If the respondent comes forward with sufficient competent evidence to establish a *prima facie*

claim or defense, a trial is required.  If the respondent fails to produce sufficient competent

evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of

law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### B.  Disparate treatment claim

Although the Plaintiffs' Complaint and the parties briefing begin with the hostile environment claim, the disparate treatment claim provides a more logical place to start because the Plaintiffs argue that much of the conduct underlying that claim informs the hostile environment claim.

To establish a claim for disparate treatment under Title VII, a plaintiff must first demonstrate a *prima facie* case of sex discrimination, showing: (i) that she met the minimum objective qualifications for the position she held; (ii) that she suffered an adverse employment action; and (iii) that adverse action occurred in circumstances giving rise to an inference of discrimination.  See e.g. *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir.2012).  If the Plaintiff carries that burden, WSFPD is required to articulate a legitimate, non-discriminatory reason for the adverse action, and the Plaintiff bears the burden of proving that the proffered reason is a pretext and the sex discrimination motivated the decision to take the adverse action. *Id.*  Similar standards apply to her state-law claim.  *See e.g. St. Croix v. Univ. of Colo. Health Sciences Ctr.*, 166 P.3d 230, 236 (Colo.App. 2007).

WSPFD appears to concede that Ms. Stroman met the objective qualifications for her position, so the Court turns to the second element of the *prima facie* case, the existence of an adverse employment action.  Ms. Stroman does not clearly and expressly delineate the acts she contends constitute adverse employment actions. At best, the Court can ascertain from Ms. Stroman's summary judgment response, she contends that she suffered the following adverse employment actions: (i) on one occasion, Darren Jacquez "failed to notify Ms. Stroman of the need for a press release . .  and instead gave this responsibility to a [less-qualified] male officer"; (ii) she was denied the opportunity to use a WSFPD vehicle when traveling on official business,

even though male employees were permitted to use WSPFD vehicles in such circumstances; (iii) Todd Vess removed her ability to access the WSPFD computer system as an administrator; (iv) Herbert Brady required her to meet with an organizational psychologist concerning a sexual harassment complaint by Ms. Schneider, even though Ms. Stroman had no involvement with the incident about which Ms. Schneider complained.   In addition, although not expressly mentioned in either party's briefing, the Court understands that Ms. Stroman also asserts that her decision to resign from employment in December 2010 constitutes a constructive discharge that could constitute an adverse employment action.

      1.  <u>Press release</u>

Turning to the press release, Ms. Stroman's response brief points to a short portion of her deposition as the only evidence addressing this matter.  Ms. Stroman testified that in June 2010, while off-duty and out shopping, she received a page noting that WSFPD officers were responding to a call of a possible drowning.  She testified that in such circumstances, the commanding officer overseeing the call (in this case, Mr. Jacquez) would typically contact her (as Public Information Officer) to relay information about the incident.  In this instance, however, she did not receive such request.  Ms. Stroman testified that she believed that Mr. Jacquez instead called a male officer, Todd Vess, and "asked him to be the [Public Information Officer]" with regard to that incident.  She infers that this is what happened because "Todd more or less said that Darren felt better talking to him."  The record does not reveal anything more about this alleged comment by Mr. Vess, when it was made, or the specific words of this comment. (In another portion of the deposition transcript, Ms. Stroman testified that, sometime after the incident, she was contacted by Captain Mike Blackwill.  In response to his explanation of the occurrence, she inquired why she was not notified earlier and was told that "Well Darren

was incident commander, and I think he just feels more comfortable with calling Todd.")  Ms. Stroman acknowledges that the incident call did not result in any news reports about the possible drowning and she did not recall seeing any incident report about the matter.

Ordinarily, an adverse action is one that results in "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007). The Court cannot say that this single instance in which Mr. Jacquez called Mr. Vess rather than Ms. Stroman constitutes an adverse employment action. There is no indication that this single incident effected a permanent change in Ms. Stroman's duties or otherwise materially modified her job requirements in any way.  (Indeed, it is not entirely clear that, other than Ms. Stroman not receiving a contemporaneous call about the possible drowning, there was any apparent change in her job responsibilities whatsoever.) Accordingly, this incident does not amount to an adverse employment action.

2. Use of official vehicle

Ms. Stroman alleges that she was denied the opportunity to use an official vehicle when male employees were given that privilege.  Her summary judgment response cites only to a short passage from her deposition in support of this contention.

Ms. Stroman testified that on one occasion in June 2010, she asked her supervisor, Mr. Brady, for permission to drive a WSPFD vehicle to attend a work-related meeting in Denver. Mr. Brady advised her (in a manner that she describes as "condescending") that "all district vehicles needed to remain in the district."  Instead, she drove her own vehicle and submitted a request for reimbursement of mileage costs, which was paid by WSPFD without objection.  Ms. Stroman acknowledges that she is unaware of whether other employees were denied the

opportunity to drive a district vehicle to a function outside of the district.  She testified that she was aware of (presumably) male employees who "often took district vehicles to classes at night," although she does not indicate where such classes occurred.

The Court cannot say that a single instance of WSPFD of denial of use of a district vehicle to attend an out-of-district event constitutes an adverse employment action.  Ms. Stroman does not testify that using a district vehicle for such purposes was a regular duty or benefit of her position.  Notably, she does not allege that Mr. Brady's refusal of her request to drive a district vehicle in June 2010 constituted a deviation from a past practice she had followed.  Rather, the record seems to suggest that her request in June 2010 was the first time she had ever asked to drive a district vehicle.  Where there is no clear evidence that driving a district vehicle was an established duty or benefit of Ms. Stroman's job, the Court cannot say that Mr. Brady's denial of that request on one occasion constituted any adverse change to those duties or benefits.  In any event, even assuming that Mr. Brady denied her a benefit she was otherwise entitled to, the record reflects that WSPFD nevertheless fully reimbursed her for the expenses she incurred in driving her own vehicle to the meeting in Denver.  Under such circumstances, in the absence of evidence explaining how receiving reimbursement for driving a private vehicle is materially inferior to driving a district-owned vehicle, the Court cannot conclude that this incident constitutes an adverse employment action.[3]

---

[3]   Even assuming it does, Ms. Stroman fails to establish the next element of the *prima facie* case: circumstances giving rise to an inference that Mr. Brady's refusal to permit her to drive the district vehicle to Denver was based on sex discrimination.  Ms. Stroman is unable to identify any similarly-situated male employee who was permitted to drive an official vehicle to an activity occurring outside the district, and she does not point to any particular sexist comments made by Mr. Brady in conjunction with the denial of her request, other than her own subjective perception that his denial was "condescending."

### 3. Administrator access to computer system

The entirety of Ms. Stroman's summary judgment response with regard to this issue consists of a single sentence: "According to Brady, Vess removed Ms. Stroman's ability to access the District computer filing system as an administrator."  In support of this contention, Ms. Stroman cites only to a passage from Mr. Brady's deposition.  He testified that, at some unspecified time, Ms. Stroman "[wrote] to the emergency reporting systems about the fact that she does not have access to what was an administrative button"; that button was "grayed out" on her screen.  Mr. Brady testified that he understood that Mr. Vess had removed administrative access to the system by everyone other than a handful of accounts "because of a problem that Mr. Vess believed he saw in the computer."  Mr. Brady had no other information about the incident, stating that "you would have to ask Todd the specifics."  The record does not reveal Mr. Vess' explanation for the incident, nor any discussion by Ms. Stroman (or anyone else) explaining the significance of access to the "administrative button" as it related to her job duties.

In the absence of any indication of the role that the "administrative button" played in Ms. Stroman's job functions, the Court cannot say that the removal of that button constituted a materially adverse employment action.  Ms. Stroman gives no indication that the removal of the button hindered her ability to perform her assigned duties or deprived her of some meaningful benefit.

### 4. Meeting with psychologist

In August 2010, in response to some complaints that Ms. Schneider had raised about sexual harassment, WSFPD arranged for an organization psychologist to meet with certain employees.  Ms. Stroman states that, although she had no involvement with the incident Ms. Schneider had complained about, Mr. Brady nevertheless required her to meet with the

psychologist.  Ms. Stroman states that she believed "she was brought into the controversy because she was the other female in the office and was, therefore, guilty by association."

The excerpt from Ms. Stroman's deposition that she points to in support of this contention largely restates discussions she had with the psychologist; she makes only a passing comment that "I didn't even know why I was brought into all of that because I wasn't part of that incident."  The record reveals no evidence establishing that Ms. Stroman was required to meet with the psychologist by Mr. Brady, whether others who were uninvolved with the incident were similarly required to meet with the psychologist, the reasons given by Mr. Brady for requiring her to meet with the psychologist, and so on.

The Court cannot conclude that Mr. Brady requiring Ms. Stroman to meet on one occasion with an organizational psychologist addressing a workplace harassment complaint constitutes an adverse employment action.  Once again, there is no evidence in the record demonstrating that this meeting interfered with Ms. Stroman's ability to perform her job duties or otherwise had any adverse effect on her employment.

### 5. Constructive discharge

Although not expressly articulated by Ms. Stroman as an adverse employment action underlying her disparate treatment claim, the Court understands Ms. Stroman's assertion of "constructive discharge" as a standalone claim in her Complaint implicitly makes such an assertion.

Although courts' loose use of terminology may sometimes create a contrary impression, there is no discrete cause of action for "constructive discharge."  The doctrine of constructive discharge may arise when an employee has, at least nominally, voluntarily resigned from employment.   Voluntary action by an employee is not usually sufficient to constitute an adverse

employment action sufficient to support a *prima facie* case of disparate treatment.  But where the seemingly "voluntary" resignation by the employee was, in actuality, compelled by the employer's own unlawful discriminatory conduct, courts may treat the employee as having been discharged by the employer, rather than voluntarily resigning.  That "constructive" discharge is sufficient to constitute an adverse employment action for purposes of the *prima facie* case.  *See generally Mitchell v. Zia Park, LLC*, 842 F.Supp.2d 1316, 1329-30 (D.N.M. 2012), *citing Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 980 (10th Cir. 2008) ("Even if an employee resigns, the plaintiff may still <u>satisfy the adverse employment action requirement</u> by demonstrating that he was constructively discharged") (emphasis added).

A constructive discharge occurs when an employer "through unlawful acts, makes working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign."  *Fischer*, 525 F.3d at 980.  Whether the circumstances are intolerable is assessed under an objective standard, and both the employee's subjective views of the situation and the employer's subjective intent are irrelevant.  *EEOC v. PVNF, LLC*, 487 F.3d 790, 805 (10th Cir. 2007).  Unlike the relatively lenient standards applicable to other aspects of the *prima facie*, an employee claiming to have suffered an adverse employment action in the form of a constructive discharge faces a "substantial" burden of showing "that the working conditions imposed by the employer are not only tangible or adverse, but intolerable."  *Id.*  The inquiry in such circumstances is "whether the employee had any other reasonable choice by to resign."  *Id.* at 806.

Ms. Stroman does not specifically address the actions by WSFPD that, she contends, rise to this level.  Presumably, however, the conduct underlying her disparate treatment claim, coupled with the conduct underlying her hostile environment claim, would form the core of any

10

contention that she was constructively discharged.  For the reasons noted above, the Court finds

that the adverse actions discussed above fail to give any meaningful support to a constructive

discharge theory.  Each of the actions are isolated and fairly innocuous, both in their effects on

the terms and conditions of Ms. Stroman's employment as well as in the lack of any overt sexism

or disparagement.  Without discounting the sincerity of Ms. Stroman's professed subjective

belief that these events were sexist and humiliating, the Court finds that an objective employee

would not have reached the same conclusions, and certainly would not have felt that any of these

incidents, individually or collectively, contributed to a belief that the working environment was

"intolerable" and that she had no other option but to resign.

That leaves the conduct underlying her hostile environment claim. As discussed below,

the Court finds that neither Plaintiff has come forward with evidence of a work environment that

can be considered sufficiently severe or pervasive so as to violate state or federal law.  Therefore,

the Court finds that Ms. Stroman has not alleged a triable issue of fact as to whether she suffered

any adverse employment action, and thus, WSFPD is entitled to summary judgment on her

disparate treatment claim (as well as her separate "constructive discharge" claim) under both

federal and state law.

**C.  Hostile environment claims**

The Court understands WSFPD to challenge both Plaintiffs' ability to establish a hostile

environment harassment claim.

To establish a claim for hostile environment sexual harassment under Title VII, each

Plaintiffs must show: (i) that she was subjected to offensive, intimidating, or insulting remarks or

conduct while at work; (ii) the conduct at issue was directed at the Plaintiff because of her sex;

(iii) the conduct was sufficiently severe and pervasive, in both an objective and subjective sense,

to alter the terms and conditions of the Plaintiff's employment; and (iv) there is a basis for imputing liability for the conduct to WSFPD.  *See e.g. Bertsch v. Overstock.com*, 684 F.3d 1023, 1027 (10th Cir. 2012).   The conduct need not be expressly sexual in nature – *e.g.* sexual propositions or insults of a sexual nature; offensive conduct that is not overtly sexual but is directed at the victim by the harasser because of the victim's sex is actionable.  *See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80-81 (1998).   Whether the conduct is sufficient to alter the terms and conditions of employment requires the Court to examine the conduct as a whole, including its frequency, its severity, whether it is physically threatening or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance.  *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002).   The same analysis is used for hostile environment claims brought pursuant to Colorado law.  *St. Croix*, 166 P.3d at 242-43.

Neither party's briefing offers a comprehensive articulation of the various events that the Plaintiffs contend underlie the hostile environment claims.  WSPFD's motion argues that the Plaintiffs' claims are based solely on Ms. Schneider overhearing Mr. Brady making an off-color joke on two occasions, once in August 2010 and another in November 2010.   The Plaintiffs' response disputes that contention, alleging in entirely general and conclusory terms, "a workplace polluted with sexual jokes, innuendos, and gender-specific comments and behavior." However, the Plaintiffs cite only to evidence concerning the two alleged jokes by Mr. Brady, an instance of Ms. Stroman experiencing inappropriate behavior from Erik Morse (and others) at a July 1, 2010 sexual harassment seminar, and the instances of disparate treatment addressed above.[4]  The Court will address these contentions in turn.

---

[4]        Although the Plaintiffs' brief cites to only the disparate treatment section as contributing

1. July 2010 incident

The record is somewhat incomplete with regard to the July 2010 incident.  The Plaintiffs'

brief contends that:

> On July 2, 1020, Ms. Stroman attended, along with various male
> employees of the District, a sexual harassment seminar conducted
> by Richard Lyons, the attorney for the District.  During that
> seminar, Firefighter Erik Morse exhibited inappropriate behavior
> by repeatedly questioning the policies Mr. Lyons outlined
> regarding harassment, including stating his opinion, much to Ms.
> Stroman and Mr. Lyon's amazement, that it was appropriate for
> male employees to disrobe in front of female employees of the
> District.  Mr. Lyons attempted to make it clear that Morse's
> opinion was in violation of sexual harassment policies, but Morse
> repeated his contention that male employees are not required to
> change what they do because women are in the workplace.
>
> Furthermore, Firefighter John Seaman approached Ms. Stroman
> after the seminar and told her that he agreed with Mr. Morse that
> such conduct, *i.e.* male employees undressing in front of female
> employees, was appropriate for the workplace.  Seaman, when
> alone with Ms. Stroman, stated that he did not understand why
> male employees should change their behavior because it makes a
> female co-worker uncomfortable.

The Plaintiffs support these contentions with a citation to a portion of Ms. Stroman's deposition

testimony.  However, the cited portions[5] of the deposition involve Ms. Stroman being asked only

---

further support to the hostile environment claim, certain acts addressed by the Plaintiffs only
with regard to the retaliation claim might also arguably support the hostile environment claim.
The Court will address those actions as part of its discussion of the retaliation claims, but has
considered them as part of the hostile environment claim as well.

[5]      The Court takes this opportunity to emphasize that it has constrained its examination of
each allegation in the parties' briefing to the specific portions of the record that are cited to in
conjunction with those allegations.  In other words, the Court does not independently canvass the
record to locate additional evidence that might support a party's factual assertion.  For example,
in ascertaining whether there is support in the record for the first paragraph of text quoted above,
the Court limits itself to reviewing pages 49-51 and page 72 of Ms. Stroman's deposition, as
these are the only portions of the record cited to in that text.  As noted, the Court finds that these
citations do not support the Plaintiffs' assertions.
       In a subsequent portion of the brief, dealing with an entirely different issue, the Plaintiffs

about her interactions with Mr. Seaman; the predicate of certain questions mention Mr. Morse or his alleged conduct, but the record provides little actual detail about Mr. Morse's comments or the circumstances surrounding them.

The deposition excerpt cited by Ms. Stroman establishes that, sometime after the July 2010 seminar, Mr. Seaman was speaking to Ms. Stroman in her office about the seminar. Mr. Seamen stated to Ms. Stroman that "he didn't feel Morse was out of line," and she responded that "I thought that he had been out of line, and that I was embarrassed and appalled by his behavior." Ms. Stroman subsequently complained about Mr. Seaman to Ms. Schneider (who was apparently the person to whom such complaints were to be made), and subsequently spoke about Mr. Seaman's comments to Tom Buxmann (one of WSFPD's Directors). Ms. Stroman acknowledges that she did not receive a response from either Ms. Schneider or Mr. Buxmann, but did not follow up on her complaints. She also acknowledges that, despite Ms. Morse or Mr. Seaman's statements, no WSFPD employee ever did disrobe in front of her.

    2.  August 2010 incident

The Plaintiffs support their contentions about Mr. Brady making an off-color joke in August 2010 with a citation to a two-page excerpt of Ms. Schneider's deposition. Ms. Schneider testified that "I walked into a staff meeting an [Mr. Brady] was telling a penis joke." She

---

do cite to a portion of Ms. Stroman's deposition that does support the text quoted above. However, it is not the Court's obligation to attempt to seek out and marshal the factual support that might exist somewhere in the record for each of a party's contentions. That is the job delegated to counsel and the Court must assume that, in each instance, counsel have performed that duty diligently and thoroughly, and that it may rely on only the specific citations that follow each proposition as reflecting the entirety of the support that the parties wish to present for that proposition. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) ("although [courts have] discretion to more broadly review the record [beyond the citations provided by counsel, courts] have a limited and neutral role in the adversarial process, and are wary of becoming advocates who comb the record of previously available evidence and make a party's case for it").

testified that she did not hear the entirety of the joke and could not remember the particular words she heard; she could recall only that it used the word "dick." Ms. Schneider testified that she spoke up and said "I don't think that's appropriate in the workplace," to which Mr. Brady responded "that's just the culture." (Although Ms. Schneider testified that she believed Ms. Stroman was in the room at the time, the Plaintiffs have not provided any testimony by Ms. Stroman regarding this incident.)

### 3. November 2010 incident

Supported entirely by a single-page, 7-line excerpt from Ms. Schneider's deposition, the Plaintiffs contend that in November 2010, Ms. Schneider "walked into another conference room when we were having a meeting, and [Mr. Brady] was telling another dick – I heard the word 'dick.' And I said, I don't think that's appropriate. And all who was standing there started to laugh." Ms. Schneider cannot recall, however, who else was attending the meeting.

The Court finds that these three incidents, taken as a whole (and even when augmented by the additional instances of conduct referenced in the disparate treatment and/or retaliation claims), fail to rise to the level of being a sufficiently actionable hostile work environment. These instances are neither sufficiently severe nor sufficiently pervasive. Although jokes using the word "dick" and comments about male employees undressing in front of female employees are certainly inappropriate in the workplace, these instances of conduct involve comparatively mild language, none of which was directed specifically at Ms. Stroman or Ms. Schneider, and none of which was apparently delivered with the specific purpose of denigrating them or other women. The fact that the Plaintiffs can cite only three instances of such conduct occurring over a five-month period indicates that the conduct was far from pervasive. As a whole, the conduct the Plaintiffs cite to is the type of "ordinary tribulations of the workplace, such as sporadic use of

abusive language, gender-related jokes, and occasional teasing" that fails to amount to a hostile environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Accordingly, the Court finds that WSFPD is entitled to summary judgment on Plaintiffs' claims of hostile environment harassment under both state and federal law.

### D.  Retaliation

Finally, the Court turns to the Plaintiffs' claims of retaliation.

To establish a claim of prohibited retaliation under Title VII, an employee must first establish a *prima facie* case by showing: (i) she engaged in conduct protected by Title VII; (ii) she suffered an adverse employment action; and (iii) an inference can be drawn that the adverse action was caused by the employee engaging in the protected conduct.  If the employee carries that burden, the employer must articulate a legitimate, non-retaliatory reason for the adverse action, and the employee bears the ultimate burden of showing that the employer's proffered reason is false and that the adverse action occurred because of the employee's protected conduct. *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1201 (10th Cir. 2006).  A similar test applies to retaliation claims brought under Colorado law. *Tafoya v. Dean Foods Co.*, 2009 WL 2762738 at n. 3 (D.Colo. Aug. 26, 2009).

WSFPD argues that it is entitled to summary judgment on both Plaintiffs' retaliation claims, albeit based on different elements for each Plaintiff.  As to Ms. Stroman, WSFPD alleges that she cannot show that she engaged in any protected activity.  As to Ms. Schneider, WSFPD argues that she cannot show that she suffered any adverse employment action.  The Court takes these contentions in turn.

### 1.  Ms. Stroman

WSFPD argues that Ms. Stroman never engaged in conduct that could be considered

protected activity under Title VII.  That statute prohibits an employer retaliating against an employee who has "opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under that statute.  42 U.S.C. § 2000e-3(a).  Protected opposition may include an employee bringing complains of perceived unlawful conduct to her employer, or the employee responding affirmatively to questions by an employer about the presence of discriminatory conduct in the workplace.  *Crawford v. Metropolitan Govt. of Nashville*, 555 U.S. 271, 276-77 (2009).

WSPFD argues that Ms. Stroman never complained to her superiors that she felt that she was being subjected to unlawful discrimination or harassment, but only that she complained that she was "being retaliated against by the firefighters because they did not want to interact with her."  The evidence it supports for this proposition consists of 6 lines from a single page of Ms. Stroman's deposition.  That excerpt, which is presented without any meaningful context as to what event or persons are being discussed, reads as follows:

> Q:  Did they ever say they didn't want to get back to you because they didn't want to interact with you?
>
> A:  No.
>
> Q:  Are you suggesting that their actions are part of your lawsuit here?
>
> A:  Yes.  I felt like I was being ignored.

This largely inscrutable evidence is insufficient to support WSFPD's contention that Ms. Stroman only ever complained of "being ignored."

By contrast, the Plaintiffs' response points to several instances in which Ms. Stroman made complaints to WSPFD officials about conduct that, arguably, could amount to a violation

of Title VII.  Specifically, she complained to Ms. Schneider, Mr. Brady, and Mr. Buxmann about the incident with Mr. Morse and Mr. Seaman.  (Ms. Stroman also argues that she complained to Mr. Lyons, the WSFPD's attorney, during the July 2010 seminar, but the record she cites to in support of that proposition does not mention Ms. Stroman complaining to Mr. Lyons.)

Although, for the reasons set forth above, the Court has profound doubts as to whether Ms. Stroman can ultimately establish that she suffered any adverse employment action that was causally connected to her complaints about Mr. Morse and Mr. Seaman's statements, the Court does not reach that question, as WSFPD has limited its challenge to Ms. Stroman's retaliation claim to the question of whether she engaged in any protected activity.[6]  Because the record establishes a least a genuine triable issue with regard to that question, WSFPD's motion for summary judgment on Ms. Stroman's retaliation claim is denied.

2. <u>Ms. Schneider</u>

WSFPD appears to concede that Ms. Schneider engaged in protected activity by making a complaint of harassment on or about March 23, 2010, but argues that she suffered no adverse employment action thereafter.  (Indeed, WSFPD appears to argue, albeit without any citation to the record, that Ms. Schneider was subsequently promoted to Interim Fire Chief.)

In response, Ms. Schneider argues that she suffered at least six adverse employment actions after March 23, 2010: (i) she was required to attend a meeting with the organizational psychologist, under threat of losing her job if she refused; (ii) that her e-mails "vanished from the District computer system," but no other employee was similarly affected; (iii) she lost her administrator access to the computer system; (iv) that "certain firefighters stopped turning in

---

[6]     WSFPD's reply brief appears to change tack somewhat, arguing that Ms. Stroman "disregards any and all attempts from the firefighters to resolve any negative feelings that existed at WSFPD" and points to evidence that Mr. Jacques "attempted to apologize to her if he hurt her feelings."   It is unclear what element – if any – this argument addresses.

their timesheets" to her, adversely affecting her ability to process payroll; (v) that Mr. Vess told

firefighters in his crew that "they were not supposed to talk to Ms. Schneider"; and (vi) that Mr.

Jacques contacted the Weld County District Attorney and falsely accused Ms. Schneider of

criminal conduct, and that Mr. Brady subsequently stated his own suspicion that she was

involved in wrongdoing.

For purposes of a retaliation claim, an adverse employment action is any action by the

employer that "might well have dissuaded a reasonable worker from making or supporting a

charge of discrimination." *Burlington Northern and Santa Fe. RR Co. v. White*, 548 U.S. 53, 68

(2006). "Petty slights and minor annoyances that often take place at work and that all employees

experience," such as "personality conflicts at work that generate antipathy" and perceived

"snubbing by supervisors and co-workers," are not sufficient. *Id.* But actions that appear on

their face to be relatively minor may, in appropriate circumstances, suffice where the actions

would indeed operate to chill the actions of a reasonable employee, such as an employer making

an unfavorable schedule change to an employee who happens to be a single mother with school

age children. *Id.* at 69.

The Court addresses Ms. Schneider's alleged adverse actions briefly. The record reflects

that the instruction that Ms. Schneider meet with the psychologist was in response to complaints

about workplace harassment and discrimination, and thus, far from chilling a reasonable

employee's interest in engaging in protected activity, such meetings would seem to a reasonable

employee to be a favorable response to such complaints. Moreover, Mr. Brady testified (and the

Plaintiffs do not appear to dispute) that every employee was asked to meet with the psychologist,

making it difficult to see how Ms. Schneider being directed to do so could be deemed an adverse

action.

As to the "disappearance" of Ms. Schneider's e-mails, she relies entirely on Mr. Brady's deposition testimony regarding that event.  Mr. Brady recalls that Ms. Schneider complained to him that her e-mails were gone, and that she was working with the IT department to investigate the issue.  Mr. Brady acknowledged that it did not appear that the problem affected his e-mails, but the record does not reflect whether any other WSFPD employees were similarly affected.  At any rate, the cited portion of the record does not indicate that the disappearance of the e-mails was the result of a purposeful act, much less that such act was traceable to anybody over whom WSFPD had control.  In the absence of proof tying WSFPD officials to the disappearance of Ms. Schneider's e-mails, the Court cannot say that this event reflects an adverse action taken against Ms. Schneider by WSFPD.

The Court has already addressed the "administrator button" issue previously, and again finds that it fails to amount to an adverse employment action of any kind.  Moreover, Ms. Schneider's deposition excerpt indicates that she was only deprived of administrator access for a single day, and that it did not interfere with her ability to perform her job.  Even under the relaxed standards for adverse actions in retaliation cases, this is insufficient.

As to timesheets, Ms. Schneider testified that prior to March 2010, she "never had an issue" with firefighters turning in their timesheets on time.  After March 2010, however, "sometimes I would get half the time sheets, sometimes I would get none of the time sheets, sometimes I would get the firefighters' time sheets and not the fire prevention time sheets." However, Ms. Schneider does not identify any WSFPD official or action that she contends was responsible for this change (*e.g.* a directive or encouragement from a WSFPD official that employees delay the submission of time sheets, or WSFPD's unreasonable failure to act upon requests by Ms. Schneider to address the situation).  Without some indication that supervisory

personnel caused or enabled the delay in submission of time sheets, the Court cannot say that the mere fact that rank and file firefighters started to delay the submission of time sheets constitutes an adverse action by WSFPD.

As to Ms. Vess allegedly telling his firefighters not to talk to Ms. Schneider, Ms. Schneider's deposition transcript – the only cited support for this contention – makes clear that Ms. Schneider has no personal knowledge of such an instruction being given.  Rather, she testified that "I was told" of this alleged statement "by Steve Szczerba."  Ms. Schneider has not supplied an affidavit or deposition testimony from Mr. Szczerba to this effect.  Ms. Schneider offers Ms. Szczerba's alleged statement – that Mr. Vess told firefighters not to talk to her – for its truth, and thus, this statement is mere hearsay.  Hearsay testimony is not sufficient to create a genuine issue of fact sufficient to avoid summary judgment.  *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1180 (10th Cir. 2013).  Accordingly, there is insufficient factual support for Ms. Schneider's contention that Mr. Vess took any adverse action against her (much less support for the contention that Mr. Vess' actions could be attributed to WSFPD itself).

Finally, the Court notes that the record establishes that in November 2010, Mr. Jacques did indeed contact the Weld County District Attorney, requesting an investigation into various alleged conflicts of interest he believed were occurring at WSFPD, including some that implicated Ms. Schneider.  The record further indicates that the District Attorney investigated some of these concerns and found them to be unfounded.[7]   Assuming, without necessarily

---

[7]       The District Attorney's memo in the record does not suggest that Mr. Jacques' contentions were frivolous or fabricated, however.  For example, he complained that Ms. Schneider was steering WSFPD business to a print shop that she had an ownership interest in. The District Attorney concluded that Ms. Schneider did indeed have an interest in the print shop that was handling all of WSFPD's business, but that she had divested herself of that interest prior to the time period at issue.

finding, that a complaint to law enforcement about an employee is an action that could be considered sufficiently adverse, the record does not adequately reflect facts that would permit the Court to conclude that Mr. Jacques' complaints can be said to be acts of WSFPD itself.  WSFPD may be held liable only for actions it takes itself or that it directs or encourages others to make. There are no facts in the record that indicate that WSFPD directed or encouraged Mr. Jacques to accuse Ms. Schneider, or that Mr. Jacques (identified only as a "shift commander") is of sufficient rank and stature that his acts necessarily bind WSFPD.  In the absence of evidence clearly tying WSFPD, as an employer, to Mr. Jacques' complaints, the Court cannot say that Ms. Schneider has carried her burden of demonstrating that <u>WSFPD</u> took some adverse action against her after her protected activity.[8]

Accordingly, the Court finds that WSFPD is entitled to summary judgment on Ms. Schneider's retaliation claim.

## CONCLUSION

For the foregoing reasons, WSFPD's Motion for Summary Judgment **(# 31)** is **GRANTED IN PART**, insofar as WSFPD is granted summary judgment on both Plaintiffs' hostile environment claims under both state and federal law, Ms. Stroman's disparate treatment claim under state and federal law, and Ms. Schneider's retaliation claim under both state and federal law, and **DENIED IN PART** insofar as Ms. Stroman's retaliation claim (along with Ms. Schneider's disparate treatment claim) will proceed to trial.  The parties shall promptly begin preparation of proposed Pretrial Order as directed by Docket # 17, and shall jointly contact chambers to schedule a pretrial conference.  The Plaintiffs' Motion to Strike **(# 45)** is **DENIED**

---

[8]     Even assuming that Mr. Jacques' acts could be considered an adverse act by WSFPD, the large temporal gap between Ms. Schneider's complaint in March 2010 and Mr. Jacques' actions in November 2010 would require Ms. Schneider to articulate additional evidence to support any causal connection between her complaint and Ms. Jacques' actions.

**AS MOOT**.

Dated this 24th day of March, 2014.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge